**Herman FRIEDLANDER, Plaintiff,**

v.

**Jerry C. NIMS, et al., Defendants.**

**Civ. A. No. C82–1900A.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 30, 1983.

Edward L. Greenblatt, Atlanta, Ga., Richard B. Dannenberg, New York City, for plaintiff.

William G. Vance, Atlanta, Ga., for Nims, Lo, and Seifert.

James S. Stokes, IV, Atlanta, Ga., for Nimslo Technology Ltd., Nimslo Corp., Olsen, Davidson, and Fred. Olsen, Ltd.

J. Wallace Adair, Ralph J. Savarese, and Gaspare J. Bono, Washington, D.C., Kent E. Mast and Richard M. Kirby, Atlanta, Ga., for Timex Corp.

Emmet J. Bondurant, II, Atlanta, Ga., for Seifert.

Thornton W. Morris, Atlanta, Ga., for Bostic.

### ORDER

SHOOB, District Judge.

This is an action alleging (1) violation of federal securities laws, (2) violation of Georgia securities laws, (3) violation of the Racketeer Influenced and Corrupt Organizations law, and (4) breach of fiduciary duty under Georgia state law. The plaintiff, Herman Friedlander, sues individually and on behalf of a proposed class of persons who held non-controlling shares in Nimslo Technology, Inc. ("NTI") which was, before its dissolution, a Georgia corporation. The defendants are persons and corporations who allegedly participated in and benefitted from fraudulent schemes associated with the transfer of assets from NTI to a series of corporations that ended with Nimslo Corporation and Nimslo Technology Limited.

The principal business of the various Nimslo corporations has been the development and marketing of a line of products and services for consumer-oriented three-dimensional photography. In 1980, the prospects for growth and future profits for the company appeared very good when, as the plaintiff claims, the management of NTI decided to effect a series of transactions that ended with the minority shareholders' being hopelessly frozen out of continued participation in the company. The plaintiff claims, in essence, that the defendants, through fraudulent statements, secured the sale of NTI's assets to financial interests allied to themselves at an unfairly low price. Mr. Friedlander seeks to represent a class of shareholders who were forced to participate in the sale of assets and who are not either defendants or their relatives, or officers of corporate defendants.

Presently before the Court are (1) a motion by Timex Corporation to dismiss the claim against it, (2) Mr. Friedlander's motion for certification of a class, and (3) discovery motions by both parties. The Court will address those motions in turn.

### I. TIMEX CORPORATION'S MOTION TO DISMISS

Defendant Timex Corporation has moved to dismiss plaintiff's action against it for failure to state a claim or, in the alternative, for failure to plead fraud with particularity as required by Rule 9(b), Fed.R.Civ.P.

Only three of the four counts of the complaint pertain to Timex. Those three counts allege violations of (1) Rule 10b–5, 20 C.F.R. § 240–10b–5; (2) section 12(d) of the Georgia Securities Act, O.C.G.A. § 10–5–12(d); and (3) the Racketeer Influenced and Corrupt Organizations ("RICO") provisions of the Organized Crime Control Act of 1970, 18 U.S.C. §§ 1961–1968. The gist of the plaintiff's complaint is that Timex con-

spired with the other defendants to gain a proprietary interest in the Nimslo 3–D camera system through a fraud perpetrated upon the minority shareholders of Nimslo.

Timex makes a broadly based attack on the complaint by arguing that the complaint neglects to accuse Timex of any wrongdoing. The Court agrees that the complaint appears to overlook Timex Corporation as a defendant. It is revealing that, as illumination of the very general allegations made against all the defendants collectively, the complaint lists specific charges, none of which is directed at Timex. *Compare* Complaint ¶¶ 39, 40, 58, 60 (general allegations) *with* Complaint ¶¶ 4, 25–31 (specific charges). Counsel for the plaintiff stated at oral argument that this was a mere oversight, but in light of the evidently careful and elaborate drafting of the complaint, the Court finds that explanation hard to believe. Furthermore, the fact that the plaintiff has never sought to amend the complaint (although in court the plaintiff's counsel suggested amendment as an alternative to dismissal) makes that explanation even less credible.

As a formal matter, however, Timex's inclusion within the group of "Nims/Olsen Defendants" does bring it within the allegations against that group.[1] Because Timex formally comes within the allegations, it becomes necessary to examine their substance to see whether they adequately state a claim.

### A. Federal Securities Claims

■ The plaintiff alleges that Timex conspired with the other defendants to defraud the minority shareholders of Nimslo by misleading written and oral communications, and by causing the formation of three corporations to effectuate the reorganization of Nimslo as a means of freezing out the old minority shareholders.

Plaintiffs specify at paragraph 52 of the complaint the alleged affirmative misrepresentations by defendants. They were (1) that Nimslo's Board of Directors considered the transactions in the best interests of all shareholders; (2) that the purchasing company was unrelated to Nims, Lo, and Nimslo Technology Inc.; and (3) that all material facts were being disclosed, and that Georgia law was being complied with. The complaint does not contain any particular allegation linking Timex to these misrepresentations.

These allegations of affirmative misrepresentations are overshadowed by a long list, in paragraph 51, of material facts allegedly concealed by the defendants; in fact, the focus of the complaint is upon the inadequate information given to the minority shareholders. For nondisclosure by Timex to be considered as an act promoting the conspiracy, the plaintiff must show some reason why Timex had a special duty to make disclosure. Even if Timex had stood on the sidelines to cheer the others on, that would not be enough: failure to reveal a fraud, without actively concealing it, would not further the conspiracy unless there were some prior relationship between Timex and the victims that created a legitimate expectation of the victims that Timex would protect them.

The complaint fails to show that Timex had such a special relationship with the victims of the alleged fraud, or that it somehow actively concealed the fraud. The complaint does show motives of Timex in joining a conspiracy, and it shows that Timex may have encouraged conspiracy. Encouragement, however, differs from conspiracy itself. In *Shell v. Hensley,* 430 F.2d 819, 827 n. 13 (5th Cir.1970), the Fifth Circuit noted that "With respect to Shell, the complaint alleges that this defendant committed acts in furtherance of the conspiracy between him and the Arizona Group. Having allegedly joined the conspiracy and taken steps to assure its success, Shell may also be held accountable for the acts of his co-conspirators in furtherance of their scheme." *See also Herpich v. Wilder,* 430 F.2d 818, 819 (5th Cir.1970) (companion case

---

1. This does not mean, however, that the allegations may necessarily survive a challenge for failure to state a claim or to plead with particularity; *see infra,* p. 1194.

to *Shell*), *cert. denied*, 401 U.S. 947, 91 S.Ct. 935, 28 L.Ed.2d 230 (1971). The Fifth Circuit saw as essential to the liability of a conspirator the commission of acts to further the conspiracy. Although this Court would consider mere agreement to commit specific acts in the future sufficient to incur liability as a conspirator, there has been no showing in this case that Timex ever proposed or agreed to do anything to further the alleged conspiracy.

It is noteworthy also that the proposal for a Federal Securities Code promulgated by the American Law Institute provides secondary liability for violations of the securities laws only for controlling persons and for those who caused or assisted a violation. The Code states:

> An agent or other person who knowingly causes *or* gives substantial assistance to conduct by another person . . . giving rise to liability under this Code . . . with knowledge that the conduct is unlawful or a breach of duty, or involves a fraudulent or manipulative act, a misrepresentation, or nondisclosure of a material fact by an insider . . . is liable as a principal. A person may cause or give substantial assistance to conduct by inaction or silence when he has a duty to act or speak.

ALI Federal Securities Code § 1724(b)(1) (Second Supp.1981). This statement supports the Court's reasoning in this case.

A conclusive claim of "conspiracy" is not enough to bring Timex before the Court. Factual elements of a conspiracy must be alleged. Because the plaintiff has not alleged any facts that state a claim against Timex for conspiracy to violate federal securities laws, his first count against Timex must be dismissed.

### B. Georgia Securities Law Claims

■ Plaintiff sues Timex and the other defendants also under section 12(d) of the

Georgia Securities Act, O.C.G.A. § 10–5–12(d). Timex claims that there is no provision for civil liability under that section. Section 12(d) states that:

> It shall be unlawful for any person in connection with the offer, sale, or purchase of any security, directly or indirectly:
>
> (1) To employ any device, scheme, or artifice to defraud; or
>
> (2) To engage in any transaction, act, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser or seller.

That provision admittedly makes no explicit reference to civil liability or private actions. Section 14, O.C.G.A. § 10–5–14, creates express civil liability for *sales* of securities in violation of section 12(a), but omits any reference to violations of the general fraud provision in section 12(d).

Section 14(e), however, states that "[n]othing in [the Georgia Securities Act] shall limit any statutory or common-law right of any person in any court for any act involving the sale of a security." O.C.G.A. § 10–5–14(e). Accordingly, the Court must determine whether there is some other avenue for relief.

O.C.G.A. § 51–1–8 states that "[p]rivate duties may arise from statute or from relations created by contract, express or implied. The violation of a private duty, accompanied by damage, shall give a right of action." Section 12(d) creates a private duty not to defraud purchasers or sellers of securities. Purchasers and sellers of securities are the intended beneficiaries of that law; if they suffer damage, they have an express cause of action under O.C.G.A. § 51–1–8.[2] The Court must therefore inquire whether the plaintiff's complaint

---

**2.** The Middle District of Georgia once stated that a civil remedy under section 12(d) existed only for buyers. *Kirk v. First National Bank of Columbus*, 439 F.Supp. 1141, 1145 n. 1 (M.D. Ga.1977). That court, in deciding a question concerning statutes of limitations, had no need to consider the effect of the predecessor of O.C.G.A. § 51–1–8; in addition, the Georgia

legislature has since that decision amended section 12(d) to add the words "or seller" in making unlawful schemes that "operate[ ] or would operate as a fraud or deceit upon the purchaser *or seller*." (Emphasis added.) *Compare* 1979 Georgia Laws 1296, 1301 § 8 *with* 1975 Georgia Laws 928, 958–959 § 24 (previous enactment).

makes out a claim under this count against Timex.

Section 12(d) of the Georgia Securities Act is similar to, but differs significantly from, Rule 10b–5. The Georgia statute omits the language of fraudulent nondisclosure present in 10b–5(2): "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." The state law concerns only active fraud.

Plaintiffs have not stated a case of active fraud against Timex: Timex has not been shown by the complaint to have "employ[ed] any device, scheme, or artifice to defraud," nor has it "engage[d] in any transaction, act, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser or seller." Accordingly, plaintiff's state law claim against Timex fails also.

### C. "RICO"

■ The plaintiff's third count alleges that Timex has violated the Racketeer Influenced and Corrupt Organizations ("RICO") provisions of the Organized Crime Control Act of 1970, 18 U.S.C. §§ 1961–1968. RICO makes illegal the (a) use or investment, in an interstate "enterprise," of income or its proceeds derived from "a pattern of racketeering activity"; (b) the acquisition or maintenance of any interest in, or control of, any interstate "enterprise" through a "pattern of racketeering activity"; (c) the conduct (or participation in conduct) of the affairs of an interstate "enterprise," by a person employed by or associated with that "enterprise," through a "pattern of racketeering"; and (d) conspiracy to do any of (a), (b), or (c). 18 U.S.C. § 1962.

The existence of a violation depends upon the presence of a "pattern" of "racketeering activity", and of an "enterprise" engaged in or affecting interstate commerce. Those terms are explained in section 1961(1). That subsection states, in pertinent part, that

(1) "racketeering activity" means ... (B) any act which is indictable under any of the following provisions of title 18, United States Code: ... section 1341 (relating to mail fraud), section 1343 (relating to wire fraud) ... or (D) any offense involving ... fraud in the sale of securities ..., punishable under any law of the United States;

. . . . .

(4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

(5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after [October 15, 1970] and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity.

Civil remedies, including treble damages, are provided under section 1964(c) for "any person injured in his business or property by reason of a violation of section 1962."

In order to recover from Timex, the plaintiff must allege (1) a pattern, of (2) "racketeering" activity, (3) through which, or with the income from which, Timex (4) acquired or maintained (or conspired to acquire or maintain) an investment in, or control of, or conducted the affairs of, (5) an "enterprise" engaged in or affecting interstate commerce. 18 U.S.C. § 1962.

Plaintiff, after incorporating other allegations, has this to say in the RICO Count of the complaint:

60. The defendants deliberately engaged in a fraud upon the plaintiff and the minority shareholders of Nimslo to acquire, through fraudulent means, complete ownership and all rights in and to the Nimslo 3–D System, and in connection therewith, used the wire services and mail and interstate communications to consummate their schemes, alleged *supra*, with the view of fraudulently "freezing out" the minority shareholders from their

equity ownership in Nimslo and the profits and benefits to be received directly and indirectly from the manufacture, marketing, and sale of the Nimslo 3–D camera and photographic processing which comprise the Nimslo 3–D System. 61. Plaintiff and the class have been damaged accordingly.

The Court is left to guess how this states a RICO claim.

The complaint nowhere states that *Timex Corporation* had any part in mailing or communicating anything by wire, except by saying that "the defendants" did so. There is no allegation that Timex committed or conspired to commit the crimes of mail fraud or wire fraud. Even had Timex participated in using the mails or wires, that is not sufficient: *crimes* are the necessary foundation of a "pattern of racketeering activity." [3]

The complaint also fails to identify an "enterprise" within the meaning of section 1961(4). The Nimslo 3–D System appears to be alleged as the relevant enterprise, but this Court does not recognize a camera system as an enterprise within the meaning of RICO.[4]

Furthermore, a statement that the plaintiff has "been damaged accordingly" does not sufficiently allege causation. A plaintiff must be "injured in business or property by reason of or violation of section 1962." 18 U.S.C. § 1964(c); *see Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir.1983). The plaintiff here alleges fraud. Fraud

alone, and injury from it, do not give rise to RICO liability.

RICO prohibits, broadly speaking, second stage criminal activity. RICO does not punish or provide a remedy for murder, kidnapping, arson, or fraud. It punishes, or provides a remedy for, the operation—acquisition, investment, maintenance, or conduct—of enterprises *through* racketeering activity or as a *result* of racketeering activity. Nothing of the sort is alleged here.

Although a court is bound to construe a complaint liberally, it is not itself obliged to state a claim on behalf of a plaintiff, particularly with regard to a cause of action that is subject to abuse, as RICO is. Because the plaintiff in his complaint has not alleged that Timex has committed predicate crimes, has not identified a relevant RICO enterprise, and has not alleged damage by reason of a section 1962 violation, he has failed to state a RICO claim.

Because plaintiff's complaint has not stated a claim against Timex on any of its counts, the motion of Timex should be granted. Even if the plaintiff had overcome the threshold of pleading imposed by Rule 12(b)(6), the claim should still be dismissed for failure to plead fraud with particularity as required by Rule 9(b). The Court, therefore, grants the motion of Timex to dismiss the claims against it, subject to the right of plaintiff to amend within fifteen (15) days to overcome the defects of his complaint. Counsel is cautioned that the strictest compliance with Rule 11, Fed. R.Civ.P., will be expected if amendment is

---

**3.** Section 1961(1)(B) lists among the types of racketeering activity acts that are *indictable* under the criminal provisions of the United States Code. One must therefore conclude that only criminal acts fall within the scope of RICO predicate offenses. This remains true even though the relevant nature of "criminality" is not strictly limited by what has traditionally been prosecuted. *See Morosani v. First National Bank of Atlanta,* 703 F.2d 1220 (11th Cir.1983).

**4.** The Court acknowledges that, because of the use of the word "includes," the meaning of "enterprise" is not limited to the examples listed in section 1961(4). But the Court here sees

no reason to expand the sense of "enterprise" so far as to include a system of products that might be the *objects* of commercial enterprise. Such an interpretation would be bizarre.

The complaint and the plaintiff's original brief are clear in purporting to claim that the camera system was the "enterprise." At oral argument, however, *plaintiff's counsel, when challenged on that point, argued instead that the RICO "enterprise" consisted of Nims, Olsen, and other defendants. It is perhaps possible for the plaintiff to find a likely candidate for the RICO enterprise, but he has not alleged one in his pleadings.

made. The Court will not hesitate to enter sanctions for false pleadings.

## II. MOTION FOR CLASS CERTIFICATION

The plaintiff seeks to certify a class under Rules 23(a) and 23(b)(3), Fed.R.Civ.P. The plaintiff must establish all four criteria of Rule 23(a) and satisfy Rule 23(b)(3). Rule 23(a) requires (1) numerousness of the class, (2) commonality of questions of law or fact, (3) typicality of the named plaintiff's claims or defenses, and (4) fair and adequate representation of the class by the named plaintiff. Rule 23(b)(3) requires that the common questions of law or fact predominate over questions affecting only individual members of the class, and that a class action be superior to other available methods of adjudication.

### A. Numerousness

There appear to be approximately 170 prospective members of the class. Even if some prospective members preferred to sue separately, the remaining number would likely be far too numerous for joinder.

### B. Commonality

Friedlander alleges that the defendants, in attempting to rid Nimslo of minority shareholders with whom they would otherwise have to share the spoils of anticipated success, engaged in schemes to defraud those shareholders. The schemes included the withholding of important information concerning Nimslo, the sending of a materially false and misleading notice and summary of the November 3, 1980 special meeting, and the arranging to sell the company at a price far below its actual worth to interests allied to Nimslo's controlling shareholders.

The questions arising under Rule 10b-5, section 12(d) of the Georgia Securities Act, and the Racketeer Influenced and Corrupt Organizations statutes are common to the class. There may be some individual issues that concern oral representations and individual reliance, but there remains a substantial core of common questions.

### C. Adequate Representation

Friedlander has retained counsel experienced with securities litigation and class actions. He claims a net worth that is sufficient to handle the expenses of prosecuting a class suit, and would be willing to go forward with the suit even if a class were not certified. The defendants have not challenged these points.

The defendants argue that Friedlander cannot adequately represent a class because his credibility is open to sharp attack. In support of that argument, they show that Friedlander signed a false affidavit and investment letter thirteen years ago. They further claim that Friedlander did not appear to be forthright during his deposition in this action. In response, Friedlander cited a statement by one of the defense counsel at the deposition that Friedlander appeared truthful. There is no issue as to Friedlander's reputation.

The Court finds that Mr. Friedlander can adequately represent a class. From the facts before the Court, it appears that his credibility is unlikely to be destroyed by the defense. The Court further finds that Mr. Friedlander has a sufficient identity of interest with other prospective class members and is sufficiently motivated to pursue the class claim with vigor.

### D. Typicality of Claims

The defendants oppose class certification primarily by attacking Friedlander as a class representative, arguing especially that Friedlander's claims are not typical of the class. The defendants argue essentially that Friedlander himself has no claim, and that he is therefore not typical of other prospective class members who do have valid claims. They assert, first, that Friedlander was not actually deceived by the materials and did not rely upon them; second, he did not diligently seek to prevent the harm; and third, Friedlander cannot now sue under Rule 10b-5, according to Fifth Circuit precedent, because when the transaction occurred he could have made a *prima facie* case for an injunction under state law. The

Court will now examine these separate contentions.

### 1. Reliance and Deception

Defendants focus upon the fact that Friedlander was not actually deceived, but was in fact made suspicious by the representations alleged to have brought about the fraud. Friedlander conceded in his deposition that, before the transaction occurred, he realized that he was getting "screwed," and that he communicated that opinion to several of the defendants as well as to other potential members of the plaintiff class. Friedlander even consulted a lawyer, before the transaction occurred, about bringing an action. As a result, defendants claim, Friedlander neither was deceived by the representations nor relied upon them.

If Friedlander's claim is destroyed by the absence of actual deception or reliance, and if Friedlander differs from the other potential class members in that regard, he should not impair their cases by acting as their proxy. The Court must therefore analyze Friedlander's claim in detail.

■ "Reliance" is not a fixed concept. The type of reliance that a plaintiff must show varies with the precise nature of the alleged type of fraud. *Cf. Shores v. Sklar,* 647 F.2d 462, 472 (5th Cir.1981) (en banc), *cert. denied,* —— U.S. ——, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983). In cases arising, as this does, under the second clause of Rule 10b–5, "the test of 'reliance' is whether 'the misrepresentation is a substantial factor in determining the course of conduct which results in [the recipient's] loss.'" *Id.,* 647 F.2d at 469 n. 5 (quoting *List v. Fashion Park, Inc.,* 340 F.2d 457, 462 (2d Cir.1965)).

In a typical 10b–5 action, traditional elements include actual deception and positive reliance, but they need not be present in every 10b–5 case. In *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153–4,

92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972), the Supreme Court held that reliance could be presumed, in cases involving misrepresentation primarily by omission, from the materiality of the omitted information. Because the misrepresentations in this case arose in large part from an alleged failure to disclose material information, reliance may be presumed.

In *Shores v. Sklar,* the Fifth Circuit upheld the district court's dismissal of a claim based upon misrepresentations in an offering circular where the plaintiff never read or otherwise relied upon the circular. The court stated that the plaintiff's admission that he did not read or rely upon the material rebutted the presumption of reliance that arises from the materiality of the undisclosed information as established in *Affiliated Ute Citizens. Shores,* 647 F.2d at 468.

*Shores* differs from this case in important respects. In *Shores* the misrepresentations did not affect the conduct of the plaintiff because the plaintiff did not read the material containing them. In other words, there was no "causation in fact," as reliance is occasionally described. In this case, however, the misrepresentations, by failing adequately to disclose the alleged breaches of fiduciary duty, prevented Mr. Friedlander from bringing suit because he considered, or his attorney at the time concluded, that the information was inadequate to take to court. Here the misrepresentations allegedly did in fact cause Mr. Friedlander to fail to bring suit. Therefore in this case adequate reliance or causation in fact was alleged.

This case is an unusual variety of Rule 10b–5 action because the decision that was affected concerned litigation, not investment, and what defendants allegedly failed to disclose was a breach of their fiduciary duty.[5] The Supreme Court, in *Santa Fe*

---

5. The alleged deception here involves more than a mere failure to disclose motives of the defendants in forcing the transaction on the minority shareholders. It involves statements by the defendants that the purchasing corpora-

tion was "wholly unrelated to NTI or to any of NTI's principal shareholders," as well as others. Such factual representations, both *direct* and *indirect* (through omissions) are at issue

*Industries v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), held that breaches of fiduciary duty are not actionable under Rule 10b–5. A footnote in that opinion left open, however, a course that courts have followed since *Goldberg v. Meridor,* 567 F.2d 209 (2d Cir.1977), *cert. denied,* 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978), in declaring that *failure to disclose* breaches of fiduciary duty is actionable under Rule 10b–5. The deception and reliance in the *Goldberg* line of cases have consisted in the lulling of potential plaintiffs into not pursuing legal means of preventing a transaction because they did not see that the true circumstances, if brought to light in court, would support an injunction to stop the transaction. The Fifth Circuit followed *Goldberg* in *Alabama Farm Bureau Mutual Casualty Co. v. American Fidelity Life Insurance Co.,* 606 F.2d 602 (5th Cir.1979), *cert. denied,* 449 U.S. 820, 101 S.Ct. 77, 66 L.Ed.2d 22 (1980).

■ The litigation decision here was alleged to have been materially affected by a failure of information. Even though Friedlander's suspicion was aroused, his decision whether to litigate depended on the information available to take to court. He depended upon the defendants to provide that information, and in that sense he relied upon their disclosure. Even if he claims not to have been fooled himself, he did rely on the defendants' representations as far as his litigation decision was concerned. Because the misrepresentations allegedly were a substantial factor in determining Friedlander's course of conduct which resulted in his failure to litigate and the alleged loss caused by the transactions, *cf. List v. Fashion Park, Inc.,* 340 F.2d at 462, Friedlander has shown sufficient reliance to state a claim, and his claim is not atypical of the prospective class on that ground.

## 2. Due Diligence

■ The defendants also attack Friedlander on the grounds that he lacked due diligence in preventing the transaction of which he now complains. The defendants here. *Cf. Alabama Farm Bureau,* 606 F.2d at

point out that Friedlander contacted attorneys before the transaction with a view to investigating possible courses of action. To fail at that point to prosecute an action, defendants claim, should prevent him from bringing a claim now and should bar his representation of a class.

The standard for due diligence in this circuit is whether a plaintiff is reckless in not investigating possible wrongdoing or acting to prevent it. *See Dupuy v. Dupuy,* 551 F.2d 1005, 1020 (5th Cir.1977), *cert. denied,* 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977). The standard is flexible, to accord with the attributes of a particular plaintiff. *Id.* at 1016. Among the factors included in the appraisal of the diligence of a plaintiff are concealment of the fraud, opportunity to detect it, position in the industry, sophistication and expertise in the financial community, and knowledge of related proceedings. *Id.* (quoting *Clement A. Evans & Co. v. McAlpine,* 434 F.2d 100, 102 (5th Cir.1970) *cert. denied,* 402 U.S. 988, 91 S.Ct. 1660, 29 L.Ed.2d 153 (1971)). The arguments adduced by the defendants do not show that Mr. Friedlander was reckless in his failure to seek an injunction at the time of the transaction. Mr. Friedlander claims that the failure was grounded in the frustration of his ability to harness sufficient information to bring before a Court in order to have a realistic hope of success.

The Court therefore sees no bar to Mr. Friedlander's claim, or to his representation of a class, on account of a failure diligently to attempt to stop the transaction at the time it occurred.

## 3. Alabama Farm Bureau and The "Prima Facie Case"

■ The Fifth Circuit, in *Alabama Farm Bureau,* 606 F.2d at 614, stated that "all that is required to establish 10b–5 liability is a showing that state law remedies were available and that the facts shown make out a prima facie case for relief; it is not necessary to go further and prove that the state action would have been successful."

610–611.

The defendants argue that a corollary of *Alabama Farm Bureau* is that if Friedlander was suspicious enough of a breach of fiduciary duty to seek legal advice, and if he had sufficient information to take to court and make out a *prima facie* case but nevertheless failed to bring suit, he has no action under 10b–5. Defendants argue that because Friedlander could have made out a *prima facie* case but did not actually go through with it he cannot sue them under Rule 10b–5 or represent a class suing under that rule.

It is far from clear that Friedlander has no case even if he could have taken a *prima facie* case under state law to court. The Eleventh Circuit did not express such a rule in *Alabama Farm Bureau,* and there are reasons not to establish it here.

The premise of decisions such as *Goldberg* and *Alabama Farm Bureau* is that corporate directors owe to their constituents information that will allow the shareholders to take action to enforce responsible action by the corporation and its officers. As the Fifth Circuit stated, "Corporate directors and officers of a corporation are under a duty to disclose their interests in other parties that engage in transactions with the corporation. The existence of such interests in a party to a securities transaction with the corporation is 'material' information to the corporation's shareholders or directors; thus, the failure to disclose such information is 'deceptive' within the meaning of Rule 10b–5." *Alabama Farm Bureau,* 606 F.2d at 608 n. 3. *See also id.* at 613.

It is not necessarily the case that the directors owe *only* so much information as would enable the shareholders to establish *merely* a *prima facie* case. In fact, the principles of *Goldberg* and *Alabama Farm Bureau* call for more than minimal disclosure that would establish a *prima facie* case; they may be fairly interpreted as requiring disclosure of *all material* information concerning breaches of fiduciary duty. If there is more information available than suffices for a merely *prima facie* case, then that additional information should perhaps

be disclosed, regardless of how far it would establish or prove a case for breach of fiduciary duty. If this rule were to apply, then the fact that Friedlander had, notwithstanding defendants' failure to disclose, evidence for a *prima facie* case would not bar his claim; and the fact that Friedlander was not actually deceived would be immaterial so long as he was prevented, by defendant's wrongful failure to disclose, from bringing to court significant, material information that might have sufficed to stop the transaction.

The Court therefore holds that, because Friedlander has alleged wrongful misrepresentations involving significant, *material* information—material because it would have affected his decision to litigate even if without it he could have made out a *prima facie* case—he has stated a valid Rule 10b–5 claim. There is no bar, for want of his own claim, to Friedlander's representation of a class.

### E. Superiority of Class Treatment

The final criterion the Court must consider is whether the common questions of law or fact predominate over individual questions, and whether a class action is superior to other available methods of adjudication. According to Rule 23(b)(3),

[t]he matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; [and] (D) the difficulties likely to be encountered in the management of a class action.

The Court finds that common questions do predominate over individual issues in this case and that a class action is the best available means of adjudicating the case. It is true that there may be different issues of reliance for various plaintiffs, and perhaps different factual issues if varying indi-

vidual oral representations were made at the shareholders' meeting. Those individual variations would not, however, outweigh the importance of the common misrepresentations at issue in the case. Furthermore, the Eleventh Circuit has recently explicitly stated that varying degrees of reliance by plaintiffs do not preclude class treatment. *Kennedy v. Tallant,* 710 F.2d 711 (11th Cir. 1983).

The record shows that, although other prospective class members have not individually brought suit, some of them have communicated with Friedlander to express support for his action. While some shareholders had very large investments which would give them the incentive to sue individually, there were 62 shareholders with holdings of 500 or fewer shares who might otherwise consider it not worth the trouble to sue. Those facts, together with the convenience of this Court as the forum for an action involving defendants headquartered in Atlanta and plaintiffs who, though dispersed, are concentrated here, and the relative ease of management of the class action, militate in favor of class certification.

■ For all the reasons expressed above, the Court conditionally certifies a class of plaintiffs, to be represented by Mr. Friedlander, comprising all shareholders of Nimslo Technology, Inc. who sold their holdings on November 3, 1980 and who are not (1) defendants, (2) officers or directors of defendants, or (3) relatives of defendants in this action.

### III. DISCOVERY MOTIONS

In an order of February 1, 1983, the Court considered a motion to compel by the plaintiff and a motion for a protective order filed by the defendants. The principal dispute between the parties at that time was over the content of a confidentiality order to be applied to the materials obtained in discovery. The Court instructed the parties to meet in order to frame a mutually agreeable confidentiality agreement, and denied the motions with leave to renew if agreement could not be reached.

The plaintiff has renewed his motion to compel and the defendants have renewed their opposition to that motion as well as their motion for a protective order. The confidentiality provision is still at issue.

Both parties have submitted proposed protective orders, and the Court has thoroughly reviewed those proposals and the accompanying correspondence. The Court adopts the revised proposed protective order submitted by the defendants, in their motion of May 2, 1983, a copy of which is attached, as being reasonably tailored to the needs of both parties. While the terms may be somewhat onerous to the plaintiff, the Court feels that the defendants' proposed order is fair and is required to protect the interests of the defendants.

### IV. CONCLUSION

In summary, the Court: (1) DISMISSES the claims against Timex Corporation, subject to the right of the plaintiff to amend the complaint within fifteen days; (2) CERTIFIES a class of plaintiffs, to be represented by Mr. Friedlander, comprising all shareholders of Nimslo Technology, Inc. who sold their holdings on November 3, 1980 and who are not (a) defendants, (b) officers or directors of defendants, or (c) relatives of defendants in this action; and (3) GRANTS the plaintiff's motion to compel, subject to the protective order for which the defendants have moved and which the Court GRANTS.

### APPENDIX

### PROTECTIVE ORDER

1.

As used herein, "Information" shall mean any documents (including without limitation, answers to Interrogatories, oral depositions, writings, drawings, schematics, formulas, plans, drafts, charts, phonograph records, tapes, computer tapes and discs, and any other information in any form), tangible things or other sources of information heretofore or hereafter produced or examined pursuant to or as a result of any form of discovery in this case, whether by

interrogatories, request for production of documents, subpoena duces tecum, deposition, or other method of discovery, formal or informal, against a party, or any of such party's present or former officers, agents, directors, employees, consultants, or other representatives, as well as all information heretofore or hereafter derived therefrom, and all copies, excerpts and summaries thereof. "Producing Party" means the party producing such Information or the party with respect to whom any present or former officer, agent, director, employee consultant or other representative is producing such Information. "Inspecting Party" means the party receiving and reviewing such Information. The term "discovery" as used herein shall mean any discovery pursuant to the Federal Rules of Civil Procedure.

2.

Any Producing Party may designate as "Confidential Information" any Information produced to any other party by the Producing Party or any of its present or former officers, directors, agents, employees, consultants or other representatives pursuant to or as a result of discovery in this case. Any such designation shall be made in good faith with the party making the designation, designating material that is reasonably confidential.

3.

The designation of Information as Confidential shall be made by the Producing Party by placing or affixing a stamp or marking upon the document (in such a manner as will not interfere with the legibility thereof) an appropriate notice such as "CONFIDENTIAL INFORMATION", "CONFIDENTIAL", or similar legend. Where the Information is in such a form that such a stamp or mark cannot be reasonably placed thereon, then such Information shall be designated "CONFIDENTIAL INFORMATION" or "CONFIDENTIAL" in such a manner as is reasonable under the circumstances. In the case of depositions, the Producing Party may request that the deposition be so marked by the court reporter.

4.

No person receiving Confidential Information shall disclose any such Confidential Information to anyone, other than the Court, except as may be specifically authorized by this Order. Further, all persons receiving access to Information designated as Confidential Information hereunder shall employ said Information to the extent that such Information is necessary for the prosecution or defense of this case. Notwithstanding anything to the contrary herein, this Order shall not apply (a) to any Information which is or becomes, without violating this Order, public information, (b) to an Inspecting Party, its attorneys, agents, representatives and employees, as to any Information which is disseminated to or otherwise received by an Inspecting Party, where the dissemination or receipt of such Information did not result from or have any connection with discovery in this case, (c) to a Producing Party, its attorneys, agents, representatives and employees, as to any Information of such Producing Party produced by such Producing Party pursuant to or as a result of discovery in this case, or (d) any Confidential Information of a Producing Party to the extent and to such persons such Producing Party in writing authorizes such Information to be released.

5.

Counsel for any Inspecting Party shall not disclose, make available or communicate such Confidential Information to any other person except that:

(a) Such counsel may disclose such Information to paralegals, clerical, accounting and support staff personnel directly and regularly employed by counsel for the parties, or any one of them, in connection with this lawsuit, to the extent that such disclosure is necessary for the prosecution or defense of this case.

(b) Counsel for an Inspecting Party or Parties to this action may disclose Information which has been produced and designated Confidential to experts, consultants, such Inspecting Party, or Parties and officers and employees of any such person provided,

however, that the following procedures and restrictions shall apply:

(1) No expert consultant, Inspecting Party, or officer or employee of any such person to whom such Information has been disclosed pursuant to this Paragraph 5(b) shall use such Information except for purposes of the prosecution or defense of this action.

(2) Counsel for an Inspecting Party or Parties disclosing documents and information designated as "Confidential" to any person designated in this Paragraph 5(b) shall prior to disclosure obtain a written agreement of any such person to whom disclosure is made to be bound by the terms of this Protective Order in the following form:

"I hereby acknowledge that information is to be made available to me which has been designated as proprietary or confidential, and that such information is provided to me solely for the purposes of assisting counsel of record or giving testimony in the case styled *Friedlander v. Nims, et al.,* U.S. District Court, Northern District of Georgia, Civil Action File No. C82–1900A. I understand that I am prohibited by a Court Order from employing such information for any other purpose and from disseminating such information to any individual who is not equally bound with respect to the use thereof. I understand that any written Confidential Information which I receive or which is otherwise in my possession is to remain in my personal custody until such Information is no longer needed for the prosecution or defense of such case, whereupon it is to be returned to counsel who provided me with said material."

## 6.

Confidential Information may be used in connection with a deposition of any person subject to the following:

(a) Any witness at a deposition whether or not otherwise bound by this Protective Order shall be informed of the contents of this Protective Order prior to the submission to him of Information designated Confidential. Said witness will be expected to sign a confidentiality agreement in the form and manner set forth in Paragraph 5(b) hereof. In the event of refusal of the witness to execute such confidentiality agreement, such witness shall nevertheless be deemed bound by the terms of this Order; furthermore the party or parties seeking to use such information and the Producing Party will secure from a court having jurisdiction over such witness such order and directions (the "Specific Order") directed specifically to such witness containing such provisions as are consistent with the terms of this Order; and the Producing Party will cooperate fully in the making of any such application;

(b) If a witness refuses to execute a confidentiality agreement as required pursuant to Paragraph 6(a), where such witness is not the Producing Party, or any present officer, director, agent, employee, consultant or other representative of such Producing Party, such Specific Order shall be obtained prior to furnishing to such Witness any Confidential Information of such Producing Party, which constitutes any of the following types of information:

(i) All financial reports, financial statements, tax returns, and similar Information;

(ii) Financial plans, forecasts, budgets, pricing information, accounting workpapers, cash flows and cash projections, and other financial documents or Information;

(iii) Marketing, sales, advertising, promotion, development and other corporate plans, strategies and schedules, customer lists and contracts and similar Information;

(iv) All Information evidencing, setting forth, relating to, or supportive of intellectual properties, formulas, formulations, designs, patterns, patents, trade secrets, formulas, plans, blueprints, schematics, devices, methods, means, processes and procedures relating to the development manufacture, preparation, packaging,

sale, lease, processing, printing or distribution of actual or potential products or services.

(v) Shareholder and ownership Information with respect to the corporate defendants, Nimslo Technology, Inc., or any present or former entity related to any of the foregoing.

(vi) Any other type of information that the parties agree to in writing which is filed with the Court.

Except as provided above in this Paragraph 6(b), Confidential Information can be furnished to a witness in connection with such witness' deposition, notwithstanding the witness' refusal to execute a confidentiality agreement pursuant to Paragraph 6(a) hereof, so long as the Inspecting Party shall join in any request thereafter made to a court having jurisdiction over such witness by the Producing Party for a Specific Order directed to such witness. The Inspecting Party shall cooperate fully in the making of any such request.

(c) All transcripts of any deposition or other hearing and any exhibits thereto shall be designated as Confidential Information and shall be subject to the terms of this Order.

7.

Confidential Information developed, revealed or included within any discovery proceedings, formal or informal, whether in the form of depositions, transcripts, interrogatory answers, document production, or contained in motions, affidavits, briefs or other documents submitted to this Court shall be subject to this Order, and the Clerk is directed to maintain such documents under seal and such documents shall be made available only to the Court and to counsel in this proceeding until further order of the Court.

8.

The Producing Party shall in the first instance determine whether information constitutes Confidential Information covered by this Order, and shall designate appropriate documents, interrogatory answers, depositions, transcripts, motions and other Information as "Confidential Information."

Should any Inspecting Party to this proceeding object to such confidential classification, the objecting party may apply to this Court to determine whether or not such classification is valid and the information entitled to protection; provided, however, that any information the designation of which is subject to dispute shall be treated as Confidential Information subject to this Order pending further order of the Court.

9.

Upon the final determination of this action, all documents, transcripts of testimony, answers to interrogatories, or other Information designated as Confidential under this Order, and all copies thereof, in the custody of counsel for the respective parties and those to whom such counsel have disclosed such Information, shall be delivered by said counsel to counsel for the respective Producing Parties. At the same time the clerk shall return to the respective Producing Parties all such Confidential Information.

10.

Any party may apply to the Court, on reasonable notice to the other parties, for relief from or modification of any provisions of this Order. Any disputes concerning objections and other matters falling within the scope of, or relating to the interpretation of, this Order shall be submitted for ruling by the Court before which this action is pending. To the extent that hearings on such matters require the disclosure of Confidential Information, all persons not specifically approved under the provisions of Paragraphs 5 and 6 herein shall be excluded from such hearings. Transcripts of such hearings, as well as motions, briefs and other papers filed with the Court in connection therewith which reveal such Confidential Information, shall be maintained by the Clerk in sealed envelopes or containers marked "Confidential—Subject to Protective Order" and access to such material shall be limited to those persons approved under the provisions of Paragraphs 5 and 6 herein.

### 11.

Subject to paragraph 10 hereof, nothing herein contained shall prevent the use of any Confidential Information in any pretrial, trial, or other hearing or proceeding in the above-styled litigation; provided however, to the extent that any such hearing or proceeding shall involve the disclosure of Confidential Information, all persons not specifically approved under the provisions of Paragraphs 5 and 6 herein shall be excluded from such hearing or proceeding. Transcripts of such hearings and proceedings, as well as motions, briefs and other papers filed with the Court in connection therewith which reveal such Confidential Information, shall be maintained by the Clerk in sealed envelopes or containers marked "Confidential Information—Subject to Protective Order" and access to such material shall be limited to those persons approved under the provisions of paragraphs 5 and 6 herein. The parties reserve their rights to request such further Orders with respect to the treatment of Confidential Information at any trial of this case, as such parties may deem appropriate.

### 12.

No coordination and cooperation among defense counsel involved in this litigation after filing of the Complaint in this litigation, including multiple representation of defendants by individual law firms, exchanges of written material, sharing of costs and expenses, and any participation therein or efforts preparatory or otherwise related thereto, shall constitute any basis for an inference as to the existence of any alleged conspiracy, past or present, be commented upon or otherwise used in any way against any defendant. From the date of filing of the Complaint in this litigation, no prior or subsequent communication or cooperation between and among counsel for defendants concerning the defense of this action, whether or not communicated or discussed with one or more defendants, shall be construed as, or be deemed to constitute, a waiver of any attorney-client, work-prod-

uct, or other privilege or of any defense or right otherwise available to the defendants, severally.