689 F.2d 1366
 Fed. Sec. L. Rep. P 98,851
Ernest H. WHITE and Mary Ellen White, Plaintiffs-Appellees,
v.
Prentice SANDERS, (Edna E. Sanders, as Executrix of the
Estate of Prentice Sanders, substituted in place
and stead of Prentice Sanders,
deceased), Defendants-Appellants,
James N. McGEE and Betty Jean McGee, Plaintiffs-Appellees,
v.
Prentice SANDERS, (Edna E. Sanders, as Executrix of the
Estate of Prentice Sanders, substituted in place
and stead of Prentice Sanders,
deceased), Defendants-Appellants,
Ora Mae REEVES and Ora Mae Reeves, as Administratrix of
Estate of L. C. Reeves, deceased, Plaintiffs-Appellees,
v.
Prentice SANDERS, (Edna E. Sanders, as Executrix of the
Estate of Prentice Sanders, substituted in place
and stead of Prentice Sanders, deceased,
Defendants-Appellants.
 No. 82-7027
Non-Argument Calendar.
 United States Court of Appeals,
Eleventh Circuit.
 Oct. 28, 1982.
 
 James K. Davis, Fite, Davis & Fite, Hamilton, Ala., for defendants-appellants.
 John A. Owens, Phelps, Owens & Jenkins, Tuscaloosa, Ala., for plaintiffs-appellees.
 Appeal from the United States District Court for the Northern District of Alabama.
 Before TJOFLAT, JOHNSON and HATCHETT, Circuit Judges.
 PER CURIAM:
 
 
 1
 Several purchasers of now worthless notes of the National Accounts Services Administration (N.A.S.A.)[1] sued Prentice Sanders, a retired insurance agent, in the United States District Court for the Northern District of Alabama for securities fraud. The plaintiffs alleged that Sanders violated Rule 10b-5 of the federal securities laws by intentionally misrepresenting to them the safety of the notes and by telling them that he had not received sales commissions from N.A.S.A. The cases were consolidated and tried before a jury, which returned a verdict for Sanders. The trial judge granted the plaintiffs' motion for a new trial, apparently in part on the ground that the verdict was against the weight of the evidence. A second trial again resulted in a jury verdict for Sanders. The plaintiffs moved for judgment notwithstanding the verdict or, in the alternative, for a new trial. The trial judge denied the motions, ruling that the statute of limitations had run on the plaintiffs' federal claims.[2] The former Fifth Circuit reversed and remanded, holding that the district court had applied the wrong limitations period. White v. Sanders, 650 F.2d 627 (5th Cir. 1981). On remand, the district judge entered judgment n. o. v. for the plaintiffs in the amount of $114,414.50.[3] Sanders appeals, arguing that the trial judge erred in not entering judgment according to the jury verdict. We agree and reverse.
 
 
 2
 Because the court below entered judgment n. o. v. in favor of the plaintiffs, we must find that there existed no "conflict in substantial evidence to create a jury question," Boeing Co. v. Shipman, 411 F.2d 365, 375 (5th Cir. 1969) (en banc), as to each independent element of the plaintiffs' claims. The separate elements of a 10b-5 claim are well established: first, "scienter of the defendant,"[4] second, "materiality of any misrepresentation or omission by the defendant," third, "the extent of actual reliance by the plaintiff on the defendant's statements," and fourth, "the justifiability of the reliance, frequently translated into a requirement of due diligence by the plaintiff." Dupuy v. Dupuy, 551 F.2d 1005, 1014 (5th Cir.), cert. denied, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977) (footnotes omitted). In reviewing the evidence, "the Court should consider all the evidence ... in the light and with all reasonable inferences most favorable to the party opposed to the (j. n. o. v.) motion." Boeing, supra, 411 F.2d at 374. Alternatively, the question presented to us is whether the plaintiffs established each of the four elements of a 10b-5 claim "so strongly and so overwhelmingly ... that reasonable men could not arrive at a contrary verdict." Id. If the plaintiffs failed to meet this standard as to any one of the elements, the question is for the jury and the judgment n. o. v. cannot be upheld.
 
 
 3
 A review of the trial transcript reveals that the parties hotly contested virtually every important factual allegation. The plaintiffs' evidence-which consisted almost exclusively of testimony from the plaintiffs and other disappointed investors-indicates that Sanders solicited, at times repeatedly, friends and acquaintances to buy the notes. In addition to telling them that he received no money for his efforts, his standard line, according to the witnesses, was that an investment in N.A.S.A. was safer than putting money in a bank, that the investments were insured, and that there was no way an investor could lose his money.
 
 
 4
 Sanders did not contest the fact that he had received some money from N.A.S.A. prior to his contact with several investors. Further, he agreed that with one exception he did not disclose that he received money from N.A.S.A.; he testified, however, that he had not been asked and did not feel it necessary to tell them in light of what he thought was his unimportant role. According to Sanders, he did not actively solicit any orders, but rather his friends and acquaintances repeatedly sought him out upon learning that he had recently invested $10,000 of his own money (which he lost when N.A.S.A. was adjudicated bankrupt in 1975) and was receiving monthly interest checks amounting to 18% annual interest.[5] He also testified that he told potential investors that he was only repeating what company officials had told him, and that they should not invest if they felt uneasy about it. Sanders repeatedly denied telling anyone that the investment was safer than a bank. He also said that he told investors only that company officials had assured him that the investments were insured and risk-free. As to the money he received from N.A.S.A., he apparently first received a check in excess of his regular monthly interest payment from an agent of N.A.S.A. named McAlister. Sanders expressed concern to McAlister that a mistake had been made, and McAlister replied, "you have been helpful to us and to help people get in touch with us that asked you to (sic), you showed us where they lived and saved us a lot of time."[6] Moreover, the amount of this payment and subsequent payments received by Sanders bore no relation to the number of his friends and acquaintances who invested.[7] He also testified at least once that he did not know whether the unsolicited income from N.A.S.A. would continue. Significantly, all of the foregoing testimony as to the circumstances of his commissions was uncontradicted by the plaintiffs. Sanders also repeatedly denied telling potential investors that he received nothing from N.A.S.A. Sanders' position on cross examination by plaintiffs' counsel was that, in light of his limited role in the sale of N.A.S.A. notes, he did not feel that it was relevant or necessary to tell people that he was "getting anything" from N.A.S.A. He also testified that he would have told people about the checks had anyone asked him, and that he did in fact tell one person.
 
 
 5
 Considering all the evidence "in the light and with all reasonable inferences most favorable to (Sanders)," Boeing Co. v. Shipman, supra, 411 F.2d at 374, we find that reasonable people could disagree as to whether Sanders knowingly or recklessly misrepresented the safety of N.A.S.A. notes and his financial relationship with N.A.S.A. Sanders represented himself merely as a friend who passed along what he had been told about a company in which he personally had invested. We agree with the conclusion of the trial judge that "Sanders did not apprise the plaintiffs about his true relationship with the companies," but this alone does not prove a 10b-5 violation as a matter of law.[8] Reading the evidence in the light most favorable to Sanders, his testimony suggests "a conflict in substantial evidence" as to whether he possessed the requisite scienter.[9] The fact that the plaintiffs put nine disappointed investors on the stand to testify against one defendant does not permit a court to reject two juries' decisions to disbelieve these nine and believe the defendant. "(I)t is the function of the jury as traditional finder of facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses." Boeing, supra, 411 F.2d at 375.
 
 
 6
 The judgment n. o. v. should not have been granted for the further reason that there existed a jury question as to whether the plaintiffs proved their due diligence-the fourth element of a 10b-5 claim. According to Dupuy, supra, 551 F.2d at 1014, "(t)his Court (has) established 'due diligence' as a separate element in 10b-5 cases, apart from questions of materiality, reliance, or defendants duties." Establishing due diligence is the plaintiffs' burden. G. A. Thompson & Co. v. Partridge, 636 F.2d 945, 953 (5th Cir. 1981). In this case, the record reflects that the plaintiffs offered little, if any, evidence as to their due diligence. Moreover, the jury might have reasonably believed that the plaintiffs were reckless in ignoring certain circumstantial evidence that should have made them suspicious about the safety of the notes or Sanders' neutrality. Any investment paying 18% annual interest in the early 1970s might have raised the eyebrows of even an unsophisticated investor. And if the plaintiffs are correct, Sanders carried with him N.A.S.A. order forms, consistently went out of his way to exaggerate the safety of the notes, travelled with N.A.S.A. officials regularly, and repeatedly visited some potential investors. We conclude from this evidence that a reasonable person could find that it was reckless to believe that Sanders was disinterested and-as some witnesses for the plaintiffs testified-to read no literature at all before investing. Thus, it was a question for the jury whether the plaintiffs met their burden of proving due diligence. Cf. Paul F. Newton & Co. v. Texas Commerce Bank, 630 F.2d 1111, 1121-22 (5th Cir. 1980) (due diligence of plaintiffs who failed to conduct investigation could not be resolved by appellate court as a matter of law); Swenson v. Engelstad, 626 F.2d 421, 424 (5th Cir. 1980) (jury finding of absence of due diligence supported by record).
 
 
 7
 Accordingly, we REVERSE the judgment of the district court and REMAND to the district court for the entry of judgment pursuant to the jury verdict in favor of Sanders.
 
 
 
 [1]
 Some investors also later purchased notes from a related firm called Collateral Accounts. Because the circumstances of the investments in both companies are the same for our purposes, we will refer only to N.A.S.A
 
 
 [2]
 The plaintiffs also alleged violations of state registration laws, but the court did not address the state claims, and the plaintiffs have abandoned them on appeal
 
 
 [3]
 The judgments were entered as follows: Ora Mae Reeves and Ora Mae Reeves as Administratrix of the Estate of L. C. Reeves, Deceased, $12,585.00; James N. McGee and Betty Jean McGee, $80,652.00; and Ernest White and Mary Ellen White, $21,177.50
 
 
 [4]
 Although the Supreme Court in Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n.12, 96 S.Ct. 1375, 1381 n.12, 47 L.Ed.2d 668 (1976), left open the question whether scienter included recklessness, the former Fifth Circuit held that "severe recklessness" is sufficient. Broad v. Rockwell International Corp., 642 F.2d 929, 961 (5th Cir.) (en banc) cert. denied, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981)
 
 
 [5]
 For example, Sanders testified that "(o)ne man hunted me for three or four days." Tr. at 710
 
 
 [6]
 Tr. at 675, 174-75
 
 
 [7]
 Sanders testified that he estimated that he did not even know half of the people whose names were on the list of investors whose investments provided him with his commissions. Tr. at 673
 
 
 [8]
 The trial court appeared to focus only on Sanders' failure to disclose his commissions and did not find as a matter of law that Sanders intentionally misrepresented the safety of the notes:
 It appears to the court that the defendant was in fact selling securities either directly or indirectly. It is clear beyond dispute that but for his activities the plaintiffs and others would have had nothing to do with this scheme. In the court's judgment, this is a fact about which reasonable men could not differ. Boeing v. Shipman, 411 F.2d 365 (5th Cir. 1969) (en banc). It also appears that at the very least the defendant did not apprise the plaintiffs about his true relationship with the companies. He was under a duty to tell the plaintiffs that he was receiving money for the sale of these securities and he did not. Memorandum Opinion of March 20th, 1979, adopted by reference in relevant part on remand, Memorandum Opinion of December 17, 1981.
 As this language-which is the only discussion in the trial court's memorandum in support of judgment n. o. v. for the plaintiffs-indicates, the trial judge made no findings of fact or conclusions of law as to the scienter of the defendant. Sanders probably did violate a duty to the plaintiffs, but the court did not discuss whether the violation was negligent, reckless, or intentional.
 
 
 [9]
 Assuming that the jury chose to believe Sanders, as was clearly its right to do, the question of scienter changes dramatically. A jury might decide that Sanders was not "severely reckless," Broad v. Rockwell International Corp., supra, in merely telling others that he was only repeating company assurances. It could have reached the same conclusion as to his failure to disclose the gratuitous commissions-particularly if the jury accepted Sanders' testimony that (1) his role was primarily passive, (2) he believed that he had received them only for driving N.A.S.A. officials to his friends' houses, and (3) he did not know whether the checks would continue. Under such circumstances, disclosure might seem unimportant